UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANE DOE,

Plaintiff,

v.

THE REGENTS OF THE UNIVERSITY OF MICHIGAN et al.,

Defendants.

Case No. 26-10451
Honorable Laurie J. Michelson

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [20]**

Plaintiff Jane Doe filed this lawsuit against the University of Michigan and several individual defendants after she was disciplined for her alleged use of AI to write course papers. (ECF No. 1.) Plaintiff, who has generalized anxiety disorder (GAD) and obsessive-compulsive disorder (OCD), maintains that the "tone, meticulous structure, [and] stylistic consistency" of her writing can be misinterpreted as AI. (*See id.* at PageID.1–2.) Unconvinced, Defendants sanctioned Plaintiff with disciplinary probation and required her to rewrite those course papers and write a reflective essay. (*Id.* at PageID.9–10.) After challenging that discipline without success, Plaintiff filed suit, asserting claims under the due process clause, the Americans with Disabilities Act (ADA), and the Rehabilitation Act (RA). (*Id.* at PageID.10–14.)

Defendants now move to dismiss Plaintiff's complaint. (ECF No. 20.) The motion is fully and adequately briefed (ECF Nos. 20, 26, 29) and does not require

further argument. E.D. Mich. LR 7.1(f)(2). For the reasons that follow, the motion is GRANTED IN PART and DENIED IN PART.

## I.

In ruling on Defendants' motion to dismiss, the Court accepts as true Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in her favor. *Thomas v. Montgomery*, 140 F.4th 335, 339 (6th Cir. 2025). Plaintiff supports the factual allegations in her complaint with separately filed exhibits to her response brief. (ECF No. 27.) Defendants pose no objection to this filing and indeed rely on it in reply. (ECF No. 29, PageID.545.) The Court will follow the parties' lead and consider those exhibits as containing information the parties are deeming integral to allegations in the complaint. *See USA Parking Sys., LLC v. Eastern Gateway Cmty. Coll.,* No. 22-3523, 2023 U.S. App. LEXIS 34066, at *8–9 (6th Cir. Dec. 20, 2023) ("The court also may consider public records, items appearing in the record of the case, and exhibits to the motion to dismiss if the complaint references them and they are central to its claims.") (citing *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016)); *Saad v. Aurora Loan Servs., LLC*, No. 13-12275, 2014 WL 1305145, at *1 n.1 (E.D. Mich. Mar. 31, 2014) ("A court may, upon its evaluation of a motion to dismiss, consider the complaint as well any documents referenced therein.") (citing *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001)).

This dispute unfolded last fall when Plaintiff was an undergraduate student in Great Books 191, a classical studies course at the University of Michigan. (*See* ECF No. 1, PageID.2.) The class was taught by Theo Nash, the course's graduate student

instructor, and Basil Duffalo, the lead instructor. (*Id.* at PageID.4.) According to Plaintiff, Nash made public "statements reflecting a predisposition to assume AI misuse by students and to treat AI-related concerns as a core academic 'values' issue." (*Id.* at PageID.6.)

The issues at the heart of this case started when Nash filed an academic misconduct accusation with the Office of Student Academic Affairs (OSAA), indicating he was "immediately suspicious" Plaintiff had used AI to write a course paper. (*Id.*) Plaintiff denied that accusation, "explaining that [her] disability-related writing traits could be misinterpreted as AI and should not be treated as proof of misconduct." (*Id.*)

Plaintiff participated in a conference with OSAA and submitted materials supporting that position. (*See id.*) Not long after, Nash filed a second misconduct accusation based on another paper written by Plaintiff. (*Id.* at PageID.7.) He attached "AI-generated comparison outputs created by prompting AI with [Plaintiff's] own outline and with instructor feedback." (*Id.*) Before OSAA's involvement on this second accusation, Nash asked Plaintiff to meet. (*Id.*) Plaintiff declined. (*Id.*) In Plaintiff's telling, Nash "interpreted her declination as 'self-destructive' and a refusal of help." (*Id.*) Plaintiff then went through the same OSAA proceeding for the second accusation. (*See id.*) OSAA found Plaintiff responsible for both accusations and sanctioned her with disciplinary probation (notated on her unofficial transcript) and also required her to write a reflective essay. (*Id.*; *see also* ECF No. 27-7.)

Five days later, Nash filed a third misconduct accusation with OSAA for another paper written by Plaintiff. (ECF No. 1, PageID.7.) Plaintiff again submitted materials to OSAA including "written notices" "explaining that an NR grade was blocking degree requirements and graduation and that her transcript and future educational opportunities were being harmed immediately." (*Id.* at PageID.8.)

Before OSAA adjudicated the third accusation, Plaintiff filed a complaint with the Dean of the College of Literature, Science, and the Arts, and the University President's Office, "about disability discrimination, retaliation, harassment, and lack of procedural neutrality in the OSAA process." (*Id.*) The University responded that Plaintiff could appeal OSAA's findings, which Plaintiff soon did. (*See id.*) That same day, Plaintiff filed a complaint with the U.S. Department of Education and the University's Equity, Civil Rights, and Title IX Office (ECRT). (*Id.*) OSAA, in turn, paused Plaintiff's appeal pending ECRT's review. (*Id.*)

ECRT dismissed Plaintiff's complaint given her approved accommodations. (*Id.* at PageID.9.) With that decision complete, OSAA then issued the same misconduct finding for the third accusation. (*Id.*) Plaintiff was also required to rewrite course papers for Great Books 191. (*Id.* at PageID.9–10.)

In Plaintiff's view, Defendants "treated disability-related traits and limitations as evidence of guilt and failed to apply disability-informed modifications in the academic integrity process." (*Id.*) That led Plaintiff to file this lawsuit. (ECF No. 1.) Plaintiff brings her claims against the Regents of the University of Michigan ("the University") and several individual defendants in their official and individual

capacities, including Nash and Duffalo, and Sean Edgerton and Christine O'Neil from OSAA. (*Id.* at PageID.4–5.)

## II.

Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 20, PageID.239.) Defendants maintain that sovereign and qualified immunity shield the University and the individual defendants in their official capacities from Plaintiff's procedural due process claim brought under 42 U.S.C. § 1983. (*Id.*) If the Court raises sovereign immunity as a jurisdictional defect, it must be decided before the merits. *See Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015). So the Court starts there. *See Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007) ("Subject matter jurisdiction is always a threshold determination.") (citation omitted).

### A.

Sovereign immunity "protects states, their agencies, and their officials (when sued in their official capacity) from suits for damages arising under 42 U.S.C. § 1983." *Metcalf v. State of Michigan*, No. 25-1963, 2026 WL 2474885, at *5 (6th Cir. Aug. 24, 2026) (citation omitted). This includes the University of Michigan. *Smock v. Bd. of Regents of Univ. of Michigan*, 353 F. Supp. 3d 651, 661 (E.D. Mich. 2018) ("The Board of Regents of the University of Michigan is a department of the state and is thus protected by [sovereign immunity].") (citing *Estate of Ritter v. University of Michigan*, 851 F.2d 846 (6th Cir. 1988)). But sovereign immunity does not apply to "suits against state officials seeking equitable relief for ongoing violations of federal law." *Wain v.*

*Bunnell*, No. 25-5722, 2026 WL 1291265, at *1 (6th Cir. Feb. 13, 2026) (citations omitted). This rule, deriving from *Ex parte Young*, 209 U.S. 123, 155–56 (1908)), "establishes 'an important limit' on and exception to a state official's sovereign immunity protections." *McKee Foods Corp. v. BFP Inc.*, 173 F.4th 242, 262 (6th Cir. 2026) (citations omitted). Two requirements govern its application: "(1) 'the complaint alleges an ongoing violation of federal law,' and (2) it 'seeks relief properly characterized as prospective.'" *Id.* (citation omitted). "For this inquiry, [courts] focus on the complaint's allegations only and do not analyze the claim's merits." *Id.* (citation omitted).

Defendants argue that the *Ex parte Young* exception to sovereign immunity does not apply because Plaintiff seeks "monetary damages and *retro*spective relief" as her "requests are all framed in the past tense, seeking to overturn the academic misconduct determinations." (ECF No. 20, PageID.347 (emphasis in original).) Plaintiff disagrees. She points to her complaint's request for an order "staying adverse transcript notations and disciplinary findings relating to the challenged responsibility findings and NR grade" as well as "preventing further adverse academic actions based on the challenged accusations." (ECF No. 26, PageID.402–403.) She also seeks "an order requiring a prompt, fair, and disability-informed process, including review by a neutral decisionmaker." (*Id.*)

As to her request for transcript relief, Plaintiff has the better of the argument. The Sixth Circuit "ha[s] held in analogous contexts that expungement of negative government records pertaining to an aggrieved individual may qualify as prospective

relief to remedy a constitutional violation." *Morgan v. Bd. of Pro. Resp. of the Supreme Ct. of Tennessee*, 63 F.4th 510, 516 (6th Cir. 2023) (collecting cases). And the Sixth Circuit relied on decisions similar to this case to arrive at that result. *See, e.g.*, *id.* at 516–17 ("pursuing expungement of university records 'serve[s] the purpose of preventing present and future harm'") (citing *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007)); *Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) ("an 'F' grade and a plagiarism conviction 'constitute[d] a continuing injury to the plaintiff' and an action to remove them was 'prospective in nature'"); *Doe v. Cummins*, 662 F. App'x 437, 444 (6th Cir. 2016) (recognizing relief available under *Ex parte Young* where a university student sought removal of a negative notation from his school record that resulted from an allegedly unconstitutional disciplinary process).

With that authority in mind, Plaintiff's requests to remove the "NR" grade from her transcript and related third-party disclosures of that grade qualify as prospective relief under *Ex parte Young*. But her request for "an order requiring a prompt, fair, and disability-informed process, including review by a neutral decisionmaker" does not. At bottom, that request seeks a do-over of the alleged insufficient due process at issue in this case. That is, unlike expungement or reinstatement, it does not constitute an "ongoing violation of federal law." *See Morgan*, 63 F.4th at 515 ("Nor does the [*Ex parte Young*] exception exist for injunctive relief 'based entirely upon past acts and not continuing conduct that, if stopped would provide a remedy to' the plaintiff.") (citation omitted).

Thus, the *Ex parte Young* exception applies only to Plaintiff's requested relief to remove the "NR" transcript notation for the disciplinary probation and third-party disclosures of that notation. Sovereign immunity otherwise protects all other forms of relief for Plaintiff's procedural due process claim against the University and the individual defendants in their official capacities.

**B.**

The Court now turns to qualified immunity with respect to the due process claim, which "shields state officials performing discretionary functions from liability for civil damages unless they violate a clearly established statutory or constitutional right." *Dyda v. Michigan Sec'y of State*, 184 F.4th 460, 470 (6th Cir. 2026) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "The doctrine 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Ashcroft*, 563 U.S. at 743).

The Sixth Circuit "encourage[s] district courts to resolve a qualified-immunity defense 'at the earliest possible point' of litigation." *Dyda*, 184 F.4th at 474 (quoting *Chrestman ex rel. Wooden v. Metro. Gov't of Nashville & Davidson County*, 156 F.4th 694, 701 (6th Cir. 2025)). But the Sixth Circuit has "cautioned that qualified immunity is 'usually' better addressed after the parties have engaged in discovery." *Id.* (citation omitted). Yet "when 'it is apparent from the complaint that the law was not clearly established[,]'" the Sixth Circuit "will uphold a district court's decision to grant qualified immunity at the motion-to-dismiss stage." *Id.* (citation omitted); *see*

*also Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.") (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

To defeat a claim of qualified immunity, the plaintiff must show that the official's conduct (1) violated a constitutional right that (2) was clearly established. *See Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 897 (6th Cir. 2019). The Court asks whether, "reading the complaint in the light most favorable to the plaintiff, it is plausible that an official's acts violated the plaintiff's clearly established constitutional right." *Id.* at 899 (citation omitted) (quoting *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016)).

"The Fourteenth Amendment's Due Process Clause bars States from 'depriv[ing] any person of life, liberty, or property, without due process of law.'" *Novak v. Federspiel*, 140 F.4th 815, 821 (6th Cir. 2025) (quoting U.S. Const. amend. XIV, § 1). "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Id.* (citations omitted). Here, the parties dispute how broadly to define a clearly established right in this context. Plaintiff says that as a university student facing serious misconduct accusations, she has a clearly established right "to a fundamentally fair process, including notice, a meaningful opportunity to respond, and a neutral decisionmaker." (ECF No. 26, PageID.404.) Defendants define the right

more narrowly, focusing on "cases where educators us[e] writing style to evaluate authorship." (ECF No. 29, PageID.544; *see also* ECF No. 26, PageID.403.)

In analyzing the due process claim as to the individual defendants, the case law supports their view. "Rather than defining a clearly established right at a high level of generality, 'clearly established law must be 'particularized' to the facts of the case.'" *Ortiz v. City of Youngstown*, No. 24-33, 2026 WL 2837313, at *12 (N.D. Ohio Sept. 22, 2026) (citing *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)). Courts do not require "a case that is 'a perfect match to the facts and circumstances of this case,' [but] the right at issue must be defined 'in a particularized sense,' such that 'in the light of pre-existing law the unlawfulness [is] apparent.'" *Dyda*, 184 F.4th at 471 (citations omitted). "The 'dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 993 (6th Cir. 2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "When multiple defendants are named then § 1983 liability is analyzed individually based on an officer's own actions." *Wiley v. City of Columbus, Ohio*, 36 F.4th 661, 669 (6th Cir. 2022) (citing *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)).

**1.**

Start with Nash. Summarizing the allegations in her complaint, Plaintiff argues "[h]e is sued because he initiated repeated disciplinary accusations based on the same disability-related traits Plaintiff's clinicians warned could be misinterpreted, used circular AI-comparison outputs generated from Plaintiff's own

materials, and escalated the matter after Plaintiff declined an unsupervised informal meeting." (ECF No. 26, PageID.405–406.) Based on the allegations in the complaint, Nash (and Duffalo) were faced with course papers that resembled the use of AI. Plaintiff has provided no case suggesting it would be "clear to a reasonable" university instructor that using AI-detection software to analyze that writing and bring an academic misconduct allegation as a result of that analysis would violate a student's procedural due process rights. *See Blevins v. E. Kentucky Univ.*, No. 18-190, 2020 WL 1078765, at *7 (E.D. Ky. Mar. 5, 2020) ("In this context—where a professor's academic judgment began a chain of events ultimately (though perhaps not causally) ending in [discipline]—Blevins has cited no cases clearly defining a procedural due process right that Pegram and/or Gamble arguably violated.").

So Plaintiff has failed to state a plausible due process claim against Nash.

**2.**

The same is true for lead instructor Duffalo. As a threshold matter, Plaintiff's complaint has few individual allegations as to Duffalo. (*See generally* ECF No. 1.) Instead, the due process count lumps Defendants together, which is not proper pleading. *See, e.g.*, *Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (finding that § 1983 plaintiffs may not "lump[] all defendants together in each claim and provid[e] no factual basis to distinguish their conduct"). In her response brief, however, Plaintiff alleges that Duffalo "personally controlled and communicated the remedial grading consequences flowing from the challenged disciplinary findings." (ECF No. 26, PageID.407.) But it is the "challenged disciplinary findings[,]" not later

correspondence with a student *about* those findings, that forms the basis of a procedural due process claim. *See Jon Jon's Inc. v. City of Warren*, 162 F. Supp. 3d 592, 602 (E.D. Mich. 2016), *aff'd,* 700 F. App'x 436 (6th Cir. 2017) ("The hallmarks of procedural due process are notice and an opportunity to be heard.") (citing *Mathews v. Eldridge*, 424 U.S. 319, 333–34 (1976)). Plaintiff provides no clearly established law that an instructor's correspondence with a student about the discipline stemming from an academic misconduct investigation violates a student's procedural due process rights. And the OSAA policy expressly allows it. (ECF No. 27-9, PageID.456 ("once the case is resolved, the instructor may proceed with a grade sanction or assign remedial work").)

**3.**

Next is Sean Edgerton. According to the complaint, he "is the OSAA Coordinator of Academic Integrity who handled Plaintiff's academic misconduct matters." (ECF No. 1, PageID.5.) He received the accusation about Plaintiff from Nash. (*Id.* at PageID.7.) From these sparse allegations, Plaintiff contends that Edgerton oversaw the "scheduling, communications, and responsibility determinations . . . at the center of the process Plaintiff challenges as constitutionally deficient." (ECF No. 26, PageID.407.) But the briefing suffers from the same deficiency noted above: Plaintiff fails to provide clearly established law that investigating an academic misconduct accusation in compliance with a university's academic procedures—including for an individual who has disabilities—violates a student's procedural due process rights. Indeed, she cites not a single case. (*See id.*)

Put differently, she identifies no right to be shielded from a reasonable academic misconduct investigation based on a disability.

It is the allegations from the pleadings, especially the extensive exhibits the parties rely on, that reveal the reasonableness of the process she received. (*See* ECF Nos. 1, 27.) They show that the investigation included what Plaintiff now contends was missing from it: "notice, a meaningful opportunity to respond, and a neutral decisionmaker." (ECF No. 26, PageID.404.) (*See, e.g.*, ECF No. 1, PageID.2 ("Plaintiff vehemently denied use of AI for the course papers and timely provided proof of the same as well as disability-related documentation explaining that traits associated with GAD and OCD . . . can be misinterpreted as artificial or dishonest behavior and are not proof of AI misuse."); *see also* ECF No. 27-7, PageID.450 (OSAA agreeing with Plaintiff over part of Nash's analysis).) Plaintiff's disagreement with the *result* of academic integrity proceedings Edgerton facilitated does not state a plausible due process claim. *See Blumberg v. Univ. Sys. of Maryland*, No. 25-1538, 2026 WL 617270, at *7 (D. Md. Mar. 5, 2026) ("No doubt, OSC afforded Blumberg those procedural protections. That he disagrees with the outcome does not, by itself, make the [due process] claim plausible.").

**4.**

Finally, as to Christine O'Neill, Plaintiff's complaint simply alleges she was the "Deputy Assistant Dean of OSAA responsible for oversight of academic-integrity processes and decisions." (ECF No. 1, PageID.5.) As Plaintiff seems to acknowledge, however, § 1983 does not permit mere "oversight" liability. (ECF No. 26, PageID.408.)

*See City of Canton v. Harris,* 489 U.S. 378, 385 (1989) ("[r]espondent superior or vicarious liability will not attach under § 1983").

* * *

In sum, the Sixth Circuit has affirmed the grant of qualified immunity "when the 'complaint establishes the defense.'" *Koch v. Dep't of Nat. Res.*, 858 F. App'x 832, 837 (6th Cir. 2021) (quoting *Siefert v. Hamilton County*, 951 F.3d 753, 762 (6th Cir. 2020)). Considering the allegations in Plaintiff's complaint, including the exhibits the parties are treating integral to the complaint, "[t]his is such a case." *Id.* Thus, because Plaintiff fails to identify the violation of a clearly established due process right with respect to the individual defendants, qualified immunity shields them from such a claim in their individual capacities. *See Dyda*, 184 F.4th at 470 ("The district court decided the issue based on the second prong of the inquiry, and because we agree with its determination, we begin and end with the clearly established prong also.").

## III.

With the immunity arguments resolved, the Court turns to the merits of the remaining procedural due process claim against the University and the individual defendants in their official capacities as well as the ADA/RA claims.

### A.

Under the Fourteenth Amendment, "[a] procedural-due-process claim requires proof of the following two elements: '(i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process.'" *Id.* (quoting *Reed v. Goertz*, 598 U.S. 230, 236 (2023)). The Court addresses each in turn.

**1.**

As to the first element, Plaintiff points to "a protected interest in 'continuing [one's] education.'" (ECF No. 26, PageID.410 (citing *Jaksa v. Regents of Univ. of Mich.*, 597 F. Supp. 1245, 1247 (E.D. Mich. 1984), *aff'd*, 787 F.2d 590 (6th Cir. 1986) and *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 600 (S.D. Ohio 2016)).)

Defendants maintain that Plaintiff does not have a protected interest here because "[s]he alleges simply that, in a singular class, she was found responsible for cheating which impacted the grade on her transcript." (ECF No. 20, PageID.354.) Tellingly, however, Defendants rely, in part, on the same cases as Plaintiff. (*See id.* at PageID.354–355.) They acknowledge that "courts have recognized an interest in continued participation in the overall education program[,]" though Defendants distinguish those cases as involving "suspensions and expulsions." (*Id.*) The distinction is unwarranted. True, the Sixth Circuit "ha[s] held that the Due Process Clause is implicated by higher education disciplinary decisions." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005) (collecting cases) (citing *Jaksa*, 597 F. Supp. 1245) ("finding due process clause implicated in suspension from university for cheating"). But the Sixth Circuit has also recognized a protected interest even absent suspension or expulsion. *See Cummins*, 662 F. App'x at 445 (finding that a student challenging an allegedly unconstitutional disciplinary process experienced an "adverse disciplinary decision [that] did, and continues to, impugn his reputation and integrity, thus implicating a protected liberty interest" even if he was "not deprived of a property interest under the Due Process Clause because he was not suspended").

The Court has been given no reason to deviate from applying this rationale to a decision involving academic, rather than disciplinary, sanctions. *See Huntsinger v. Idaho State Univ.*, No. 14-00237, 2014 WL 7149634, at *1 (D. Idaho Dec. 15, 2014) (finding that a student "had a property interest in her credits and course work at the University, as well as a liberty interest in maintaining her good name, reputation, honor and integrity" where she was alleged to have cheated on an exam and received a failing grade and labeled a "cheater"). Thus, Plaintiff adequately alleged a protected interest, so she satisfies the first prong of her procedural due process claim.

**2.**

"Once it is determined that due process applies, the question remains what process is due." *Flaim*, 418 F.3d at 633–34 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). "The Supreme Court recognizes a significant distinction between 'the failure of a student to meet academic standards and the violation by a student of valid rules of conduct.'" *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 549 (6th Cir. 2013) (quoting *Bd. of Curators of Univ. of Mo. v. Horowitz,* 435 U.S. 78, 86 (1978)). The parties, though, do not address this distinction. (*See* ECF Nos. 20, 26, 29.) But Plaintiff relies on the academic misconduct standard without opposition. (ECF No. 26, PageID.411 (citing *Eid v. Wayne State Univ.*, 599 F. Supp. 3d 513, 533 (E.D. Mich 2022)) ("[T]he student [must be] fully informed of the faculty's dissatisfaction with the student's academic progress" and "the decision to dismiss [must be] careful and deliberate.").) The Court will follow the parties' lead. *See In Re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 143 F.4th 718, 725 (6th Cir. 2025) ("In our adversarial

system, we follow the principle of party presentation, which means that we 'rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.'") (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). As so framed, when considering a motion to dismiss a procedural due process claim, "the question is whether plaintiff's complaint alleges sufficient facts, which, taken as true, plausibly show that either she was not fully informed of defendant's dissatisfaction with her performance or that her [discipline] was not made carefully and with deliberation." *Worcester v. Stark State Coll.*, No. 18-1704, 2019 WL 3006429, at *3 (N.D. Ohio July 10, 2019), *aff'd*, 806 F. App'x 460 (6th Cir. 2020).

Plaintiff has not made this showing. To start, she "accept[s] that some procedural formality was provided." (ECF No. 26, PageID.410.) She was advised of the accusations that she used AI to write course papers. (*See, e.g.*, ECF No. 1, PageID.2.) Her sanctions included disciplinary probation notated on her unofficial transcript, a requirement to write a reflective essay, and rewriting course papers. (*Id.* at PageID.9–10.) But before they were imposed, Plaintiff was given opportunities to provide her side of the story, including that her GAD and OCD caused writing traits that could be mistaken for AI. (*Id.* at PageID.2 ("Plaintiff vehemently denied use of AI for the course papers and timely provided proof of the same as well as disability-related documentation explaining that traits associated with GAD and OCD . . . can be misinterpreted as artificial or dishonest behavior and are not proof of AI misuse.").) She provided medical documentation to OSAA (*see id.*), and OSAA expressly

considered that information in its decision. (*See* ECF No. 27-7, PageID.450 (correspondence from OSAA to Plaintiff outlining "a great deal of evidence" she provided that OSAA reviewed, including "letters of support from [her] health care providers").) In effect, Plaintiff "admits that [s]he received exactly the due process [s]he requested." *Qiu v. Univ. of Cincinnati*, 803 F. App'x 831, 838 (6th Cir. 2020).

Pivoting from the process provided, Plaintiff maintains that OSAA's sanctions "rested on Nash's self-confirming AI comparison outputs." (ECF No. 26, PageID.411.) That argument is unsupported by Plaintiff's allegations and exhibits. Again, they show that OSAA considered Nash's conclusions against Plaintiff's explanations. (ECF No. 27-7, PageID.450 ("During our meetings, you denied these allegations. You walked through your writing process for each of your assignments and drafts. You also provided a great deal of evidence . . . .").) And when forming its decision, OSAA even credited information Plaintiff provided that sufficiently disputed one of Nash's conclusions. (ECF No. 27-7, PageID.450 ("In your evidence you indicated that the idea of the 'rat king' was something talked about in your discussion section which we were able to confirm.").) Yet still, Plaintiff argues that OSAA "left the accusing instructor as the gatekeeper of remediation while Plaintiff's appeal remains frozen." (ECF 26, PageID.411.) But the imposition of sanctions did not involve Nash; OSAA imposed disciplinary probation (and the unofficial transcript notation) independent of Nash (or Duffalo) and required submission of the reflective essay directly to OSAA. (ECF No. 27-7, PageID.450–451.) True, Defendants explained to Plaintiff that "sanctions remain in effect pending an appeal" and "once the case is resolved, the instructor may

proceed with a grade sanction or assign remedial work, and the submission of an appeal does not negate that authority." (ECF No. 27-9, PageID.456.) But that timeline is of no consequence because Plaintiff's procedural due process rights were satisfied before she took an appeal. *See Yoder*, 526 F. App'x at 551 (6th Cir. 2013) (explaining that "a post-dismissal appeal hearing [is] not constitutionally required"); *Eid*, 599 F. Supp. at 534 ("And then, Plaintiff went through two rounds of appeals, well beyond what is constitutionally required.").

All told, "[w]hen assessing whether an academic dismissal constituted a due process violation, '[a] court must 'show great respect for the faculty's professional judgment' and may not 'override' that judgment 'unless it is such a substantial departure from accepted academic norms as to demonstrate that the . . . committee responsible did not actually exercise professional judgment.'" *Id.* at 533 (citations omitted). The parties rely on this academic-dismissal standard even though this case involves assessing whether a disciplinary probation notation on an unofficial transcript and a requirement to write a reflective essay and rewrite course papers constitute a due process violation. (ECF No. 20, PageID.355; ECF No. 26, PageID.410–411.) But based on the allegations in the complaint and attached exhibits, the Court cannot find that Defendants departed from accepted academic norms or failed to exercise professional judgment. As a result, Plaintiff fails to state a procedural due process claim.

**B.**

The Court turns next to Plaintiff's claims under the ADA and Section 504 of the RA. (ECF No. 1, PageID.10–13.) She asserts a disability discrimination and failure to accommodate theory under both laws, as well as a retaliation claim under the ADA. (*Id.*) The Court need only examine these claims against the individual defendants in their official capacities because Plaintiff "does not contest dismissal of individual-capacity ADA and RA claims." (ECF No. 26, PageID.412.)

"Claims brought under the ADA and Section 504 generally are evaluated together." *Knox County, Tennessee v. M.Q.*, 62 F.4th 978, 1000 (6th Cir. 2023) (citations omitted). "Plaintiffs must establish each of the following elements to prevail under either law":

> (1) The plaintiff is a 'handicapped person' under the [law]; (2) The plaintiff is 'otherwise qualified' for participation in the program; (3) The plaintiff is being excluded from participation in, or being denied the benefits of, or being subjected to discrimination under the program solely by reason of [her] handicap; and (4) The relevant program or activity is receiving Federal financial assistance.

*Id.* (citation omitted).

"A plaintiff may allege disability discrimination under two available theories: intentional discrimination and failure to reasonably accommodate." *Id.* (citations omitted). "An intentional discrimination claim lies where the defendant treated someone less favorably on account of [her] disability; '[p]roof of discriminatory motive is critical.'" *Id.* (citation omitted). The other theory, failure to accommodate, is when "the defendant reasonably could have accommodated [her] disability but refused to do so, and that this failure to accommodate 'imped[ed] [her] ability to participate in,

or benefit from, the subject program." *Id.* (citations omitted). "Courts are mindful of school administrators' educational expertise in reviewing the reasonableness of their selected accommodations." *Id.* (citation omitted).

From the pleading, Defendants assume that "Plaintiff is disabled, otherwise qualified to participate in the University's programs, and suffered an adverse action." (ECF No. 20, PageID.358.) The Court will do the same.

**1.**

The Court starts with Plaintiff's discrimination theory, which she pleads together with the failure to accommodate theory. She describes the discrimination theory in her response brief as follows:

> Nash's public statements reflecting a 'paranoid' predisposition to find AI everywhere, combined with his decision to file three successive accusations grounded in the very writing traits Plaintiff's clinicians had warned would be misinterpreted, and OSAA's decision to sustain those findings while disregarding the clinical record, collectively support an inference of intentional discrimination.

(ECF No. 26, PageID.415.)

For their part, Defendants do not advance significant argument on this claim. (*See* ECF No. 20, PageID.358 ("With respect to the denominated claims of 'discrimination,' the Complaint does not actually contain any allegations of direct (i.e., intentional) discrimination. For that reason and to that extent, Claims I and II should be dismissed.").) Yet Plaintiff maintains that her discrimination claims "are supported by allegations of intentional and disparate impact theories of discrimination." (ECF No. 26, PageID.414.) Although the parties do not address it, the Sixth Circuit has "conclude[d] that [the RA] does not prohibit disparate-impact

discrimination." *Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235, 241 (6th Cir. 2019). So for purposes of that claim, the Court will focus only on intentional discrimination.

There can be no dispute that Plaintiff pleads Nash's "paranoid' predisposition" to find AI (ECF No. 1, PageID.6), and her submission of clinical evidence explaining why, given her disabilities, her writing style might be misinterpreted as coming from the use of AI (*id.* at PageID.2). It is also true that the exhibits Plaintiff attached to her response brief that the parties are treating as integral to the allegations in the complaint, show that OSAA reviewed her clinical record. (*See* ECF No. 27-7, PageID.450 (correspondence from OSAA to Plaintiff outlining "a great deal of evidence" she provided and OSAA reviewed, including "letters of support from [her] health care providers").) But at this stage of the case, the Court must accept as true Plaintiff's allegation that OSAA disregarded the medical evidence. (*See* ECF No. 1, PageID.11 (Plaintiff's allegation that Defendants "subjected [her] to discrimination solely by reason of disability" because, "among other things[,]" they "treat[ed] disability-related writing traits as evidence of misconduct"); ECF No. 26, PageID.415 (OSAA "disregard[ed] the clinical record" which in part "support[s] an inference of intentional discrimination").) In other words, although Defendants considered and/or reviewed Plaintiff's medical records, she plausibly pleads that they discriminated against her by disregarding them to find that she used AI when the writing style of the course papers could have resulted from her disabilities.

Plaintiff further alleges that she provided Nash and Duffalo with information about her disability accommodations such that they were on notice of her disabilities. (*See* ECF No. 1, PageID.5–6.) She pleads that she rejected Nash's request to meet with him outside of OSAA. (*See id.* at PageID.7.) Taking these allegations as true and drawing reasonable inferences in Plaintiff's favor, that rejection likely resulted from the effects of her disabilities, including difficulty with "live verbal defense, rapid processing, and adversarial questioning." (*Id.* at PageID.5.) Indeed, that is seemingly why "Plaintiff requested that OSAA permit her to present her defenses in writing rather than through additional live Zoom proceedings, consistent with her disability-related limitations." (*Id.* at PageID.8.) But Nash, according to the allegations, interpreted Plaintiff's rejection of his request to meet as "self-destructive" and then followed up with another misconduct accusation to OSAA. (*Id.* at PageID.7 (alleging, in the same paragraph, that this accusation followed after Plaintiff declined to meet with Nash outside of OSAA).) Accepting these allegations as true, combined with Plaintiff's allegations about Nash's "'paranoid' predisposition" to find AI (ECF No. 26, PageID.415; ECF No. 1, PageID.6), Plaintiff plausibly pleads a claim for disability discrimination under the ADA/RA.

**2.**

The Court turns next to Plaintiff's failure to accommodate theories. She advanced two different accommodation requests but now concedes one. (ECF No. 26, PageID.414 ("Plaintiff acknowledges this [second] particular request was accommodated").) So the Court will only analyze Plaintiff's first request: "that OSAA

not treat writing style alone as dispositive evidence of AI misuse when the student had provided documented medical evidence that Plaintiff's disability produces exactly the kind of writing style being relied upon." (*Id.* at PageID.413.) But Plaintiff fails to plausibly plead a lack of "accommodation" for purpose of the ADA or the RA because Plaintiff affirmatively pleads that she submitted, and Defendants considered, her "documented medical evidence." (ECF No. 1, PageID.6 ("Plaintiff submitted medical and psychological documentation to OSAA explaining that disability-related writing traits could be misinterpreted as AI and should not be treated as proof of misconduct.").) *See Dungey v. Culmen Int'l LLC*, No. 21-01027, 2022 WL 4357443, at *5 (E.D. Va. Sept. 20, 2022) (ADA claim dismissed at the pleadings stage where accommodation requested was already provided). That Plaintiff disagrees with OSAA's ultimate disposition does not mean OSAA failed to accommodate her by reviewing her medical records. *See Redding v. Noem*, 168 F.4th 203, 209 (4th Cir. 2026) (affirming dismissal of RA claim at the pleadings stage, explaining that "dissatisfaction does not amount to a failure to accommodate"). Plaintiff's self-submitted documentation proves the point. (*See* ECF No. 27-7, PageID.450 (correspondence from OSAA to Plaintiff outlining "a great deal of evidence" she provided and OSAA reviewed, including "access to [her] Google documents, letters of support from [her] health care providers, links to all the sources consulted during [her] writing process, a link to the word counter [she] use when typically writing longer assignments, and additional clarifying statements").)

In sum, Plaintiff has failed to plausibly plead a failure to accommodate by failing to consider her "documented medical evidence" when Plaintiff's own exhibits show that she submitted and OSAA considered that information. (*See id.*) And to the extent that Plaintiff argues Defendants failed to accommodate her by considering writing style as conclusive to whether she improperly used AI, that fails for the same reason: OSAA considered her "provided documented medical evidence that [her] disability produces exactly the kind of writing style being relied upon." (ECF No. 26, PageID.413.)

**3.**

The Court concludes with Plaintiff's retaliation claim under the ADA (ECF No. 1, PageID.12–13), which requires Plaintiff to show:

> (1) [she] engaged in an activity protected under the ADA; (2[Defendants] knew of that activity; (3) [Defendants] took an adverse action against [her]; and (4) there was a causal connection between the protected activity and the adverse action.

*Moody v. MidMichigan Med. Ctr. Midland*, 704 F. Supp. 3d 772, 780 (E.D. Mich. 2023) (citing *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014)). To survive Defendants' motion to dismiss, however, Plaintiff must only allege sufficient facts for the Court to infer that Defendants retaliated against her because of her protected ADA activity; she need not plead a prima facie case of retaliation. *See, e.g.*, *Jaleelah Hassan Ahmed v. Hamtramck Pub. Schs.*, 178 F.4th 975, 981 (6th Cir. 2026) (analogous FMLA context).

Plaintiff contends that filing complaints with the University constituted protected activity, and that OSAA's pause in her appeal "while sanctions remained

in effect" constituted an adverse action. (ECF No. 26, PageID.415–416.) "To be adverse, a retaliatory action must be enough to dissuade a reasonable person from engaging in the protected activity; 'petty slights or minor annoyances' cannot qualify." *A.C. v. Shelby County Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). But OSAA's pause in Plaintiff's appeal arose from University policy applicable to all students. *See* University of Michigan College of Literature, Science, and the Arts, Procedures for Resolving Violations of Academic Integrity, https://perma.cc/Z5G7-LYWQ ("If an appeal is based on discrimination or other prohibited behavior, students must also file a report with the Equity, Civil Rights & Title IX Office (ECRT). *The appeal process will pause until that matter is resolved.*") (emphasis added).)[1] Defendants complied with that policy. (ECF No. 27-5, PageID.441 (OSAA asked Plaintiff whether she has "filed a report with ECRT regarding your disability, harassment, and retaliation concerns" and advised her "[t]hat process will need to play out before we are able to move forward with your appeal."; *see also id.* at PageID.440 ("[a]n appeal cannot move forward for consideration until ECRT has resolved their complaint").) This means the pause in her appeal was standard compliance with policy and not *because* Plaintiff filed a complaint. *See Heilmann v. Yeshiva Univ.*, No. 25-2431, 2026 WL 2875193, at *10 (S.D.N.Y. Sept. 24, 2026) (dismissing student's ADA retaliation claim where

[1] *See Jones v. Sexton*, No. 23-01033, 2025 WL 3000203, at *3 n.6 (M.D. Tenn. Oct. 24, 2025) (explaining that "[t]he Court is able *sua sponte* to take judicial notice of the contents of a .edu website").

student "has not . . . shown that YU took adverse action against him because of this protected activity").

Thus, Plaintiff fails to plausibly plead that Defendants retaliated against her because she filed complaints by complying with their policy and pausing the OSAA proceeding. As a result, she fails to state a claim for retaliation under the ADA.

**IV.**

Two other matters remain. First, Plaintiff's request for declaratory relief. (ECF No. 26, PageID.416–417.) After Defendants filed their motion to dismiss, Plaintiff indicated that she "does not object to treating" this request as one "tied to the surviving" claims and not as an independent claim. (*See id.*) Because Plaintiff's claims under the ADA/RA for disability discrimination survive, this request does as well as to those claims. (ECF No. 1, PageID.14 (requesting a declaration that "Defendants' actions and omissions violated the ADA [and] Section 504 of the Rehabilitation Act").) And second, Plaintiff requests leave to amend her complaint. (ECF No. 26, PageID.417.) But without including a proposed amended complaint, *see* E.D. Mich. LR 15.1, or any explanation of the amendments she seeks to make, the Court cannot evaluate the propriety of her request. So it is denied without prejudice.

**V.**

For the reasons provided above, Defendants' motion to dismiss (ECF No. 20) is GRANTED IN PART and DENIED IN PART. Specifically, Plaintiff's due process claim, ADA/RA claims as it relates to Defendants' failure to accommodate, and ADA retaliation claim are dismissed, but Plaintiff's ADA/RA claims as it relates to

disability discrimination against Defendants in their official capacities, and the corresponding request for declaratory relief, remain in the case. And Plaintiff's request to amend her complaint is denied without prejudice.

IT IS SO ORDERED.

Dated: November 9, 2026

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE